## Norfolk

### ROBERT H. FIELDS, SR.

v.

### COMMONWEALTH OF VIRGINIA

No. 0088-85

Decided May 6, 1986

COUNSEL

S. Earl Griffin (Griffin, Pappas and Scarborough, on brief), for appellant.

John H. McLees, Jr., Assistant Attorney General (William G. Broaddus, Attorney General, on brief), for appellee.

OPINION

**HODGES, J.**—Robert H. Fields, Sr. was tried and convicted by a jury of second degree murder and use of a firearm in the commission of murder. In accordance with the jury's verdict, the court sentenced Fields to twenty years in the penitentiary for the murder and two years on the weapons charge. The convictions were

based upon the killing of Kerri Lynn Cuffee on November 4, 1984, in the City of Portsmouth.

The only eyewitness to testify about the killing was Emma Charlton, in whose home the incident occurred. Fields' appeal is based upon certain aspects of her testimony. He contends that the trial court erred in refusing his multiple motions for mistrial made during Charlton's testimony, and alleges that the court interfered with his right to impeach Ms. Charlton's testimony. The majority of Fields' mistrial motions were in response to the solicitation by the Commonwealth of evidence of Fields' bad character prior to introduction by Fields of evidence of his good character. The court held that Fields, through his opening statement, had opened the door to character evidence, and overruled his motions.

. The pertinent portion of defense counsel's opening statement was:

> Now, ladies and gentlemen, what we believe that in fact the evidence will show is that Bobby Fields on the date in question is going to have been substantially the same as any person that's sitting in the courtroom, yourselves or others that are here in terms of being a functioning, law-abiding member of society, an individual who's never been convicted of any felony . . . his life had not been one that had been led in such fashion that you would expect him to be sitting at that table today . . . .

Field's defense strategy was to portray the shooting of Kerri Cuffee as an accident which occurred while he jokingly tried to "scare" Cuffee and Emma Charlton. Charlton's testimony directly contradicted this version of the incident, and her testimony was of paramount importance to the Commonwealth's case. Charlton testified that on the evening of the shooting Fields came to her back door, knocked and identified himself as "John," and then pushed his way in when Charlton cracked open the door. Fields pointed a gun to Charlton's head and threatened to kill her and her family if she said anything. He then proceeded into the front room of the home where the victim was sitting on the couch. According to Charlton, Fields stood over the victim with the gun pointed to her face, and in an angry tone asked her, "Why did you do this to me,

K.C.? Why did you do this?" Fields then fired the gun and shot Kerri Cuffee.

During cross-examination of Charlton, defense counsel questioned her about her knowledge of the fact that the victim and defendant had been friends for a number of years.

Q: And you were further familiar with the fact that on November 4, of '83 that they, too, had been friends for some number of years, is that correct?

A: Yes.

Q: As a matter of fact, they had been very good friends some number of years, is that a fact?

A: I don't know how good friends they was but I know they was friends.

Q: You had been in their company a number of times and you know they got along well and that they, you had never seen them have any kind of argument of any kind?

A: Well, Bobby Fields used to, he liked to see his womens (sic) get off together and he used to have us to do that.

Q: Well, let me ask you this. My question was had you in fact known that they had been friends for some time and for some number of years and to your knowledge that they'd never had any type of argument of any kind, is that correct?

A: I wouldn't know.

Counsel rephrased his question again and Charlton admitted she'd never seen the victim and defendant argue.

On re-direct, the Commonwealth asked Charlton to clarify her earlier remarks: "Now, Mr. Griffin asked you, you answered Mr. Griffin something to the effect that Bobby Fields liked his women to get off together. Would you tell the jury exactly what you meant by that?" She replied, "I meant he liked for his women to have sex." The Commonwealth continued: "With whom?" Charlton said, "With each other." Fields objected, and the following

exchange took place at the bench:

THE COURT: Mr. Griffin, you opened the door for this. You asked questions that elicited he liked for his women to be together . . . .

MR. GRIFFIN: I never asked the question.

THE COURT: Yes, you did.
\* \* \* \* \*

If there was some relationship between these women that would give him a motive, give him reason to be angry about their conduct, I feel the door's been opened and they are entitled to develop that.
\* \* \* \* \*

You didn't object to it. Also, Mr. Griffin, in your opening statement you made the statement this man lead an exemplary life, his character was good . . . .

MR. GRIFFIN: I said he'd never been convicted of a felony.
\* \* \* \* \*

THE COURT: Now, Mr. Simmons, I take it by your question that you have just asked about his women having sex together that you've got another question to ask, "What do you mean by his women?" If you're just going to stop right there, we're going to have a mistrial because that's got nothing to do with any motive or anything else.

MR. SIMMONS: No, I would specify . . . .
\* \* \* \* \*

THE COURT: If you're able to develop what special relationship this man had with this women and what kind of business connections if any he had with them, I think you're now on firm ground . . . If you're going to stop, if your questioning is going to stop with that question and no more, then I think you're not on very sound ground . . . .
\* \* \* \* \*

MR. SIMMONS: I don't plan to stop right there, but at the same time I think it can be tied in before we rest our case.

The court then further addressed Commonwealth's Attorney:

[I]f you are just going to leave us with the fact that this man liked his women to make love together without showing any reason why that's relevant to this case . . . then that's highly prejudicial and that's an attack on his character and it would not be relevant. But if you can tie up that activity with something in the case, then it would be relevant. Now, if you can assure the court that you are going to do that and are able to do that, then I will allow the case to continue.

The Commonwealth's Attorney assured the court that the relationship between the defendant, the deceased and Emma Charlton would be developed and would be relevant to show motive for the killing. Later during re-direct, the Commonwealth questioned Emma Charlton about the defendant's reputation:

Q: And are you familiar with Robert H. Fields, Senior's reputation in the community?

A: Yes.

Q: And would you state whether that reputation is good or bad?

A: Bad.

The defendant objected. The court asked, "Reputation for what? Reputation for being a law-abiding citizen?" Charlton replied, "Bad." Out of the hearing of the jury, the court considered defendant's motion for a mistrial and subsequently refused to grant a mistrial on the grounds that defendant had put his character for peacefulness into issue. Defendant noted his exception to the ruling.

The Commonwealth is not permitted to introduce evidence of the defendant's bad character unless the accused has first offered evidence of his good character, thus placing his character

into issue. *Smith* v. *Commonwealth,* 212 Va. 675, 676, 187 S.E.2d 191, 192 (1972); *Jones* v. *LaCrosse,* 180 Va. 406, 410, 23 S.E.2d 142, 144 (1942). When the defendant places his character into issue, he may not establish his good character by proving specific acts; likewise, the Commonwealth may not rebut evidence of good character by showing specific acts of bad conduct. *Land* v. *Commonwealth,* 211 Va. 223, 225, 176 S.E.2d 586, 588 (1970); *Zirkle* v. *Commonwealth,* 189 Va. 862, 871-72, 55 S.E.2d 24, 29-30 (1949). In addition, the general rule in Virginia is that evidence that the accused has committed crimes other than the offense for which he is being tried is inadmissible. *Lewis* v. *Commonwealth,* 225 Va. 497, 502, 303 S.E.2d 890, 892-93 (1983); *King* v. *Commonwealth,* 217 Va. 912, 914, 234 S.E.2d 67, 69 (1977).

The Commonwealth argues that it was permitted on re-direct to have Emma Charlton clarify her statement "he liked to see his womens (sic) get off together" so that the jury would not be left to speculate on the meaning of the answer. In addition, the Commonwealth argues that this evidence was invited by the defendant since he elicited the initial testimony about the conduct, and failed to request that the answer be stricken as unresponsive. The Commonwealth concedes that it was unable to prove the reason for Fields' anger with the victim, but argues that the re-direct testimony was admissible to rebut the impression that Fields sought to create that he and the victim were long-standing friends.

■ The reason for the general rule that evidence of unrelated crimes is inadmissible is that it tends to confuse one offense with the other, unfairly surprises the defendant with a charge he is unprepared to defend against, and tends to reverse the presumption of innocence by showing that the defendant has a criminal propensity. *Lewis* v. *Commonwealth,* 225 Va. 497, 502, 303 S.E.2d 890, 893 (1983); *see also Brown* v. *Commonwealth,* 222 Va. 571, 573, 282 S.E.2d 18, 19 (1981). There are exceptions to the general rule:

Evidence of other offenses is admitted if it shows the conduct and feeling of the accused toward his victim, if it establishes their prior relations, or if it tends to prove any relevant element of the offense charged. Such evidence is permissible in cases where the motive, intent or knowledge of the accused is involved, or where the evidence is connected with or leads up

to the offense for which the accused is on trial. Also, testimony of other crimes is admissible where the other crimes constitute a part of the general scheme of which the crime charged is a part. Frequently it is impossible to give a connected statement showing the crime charged without incidental reference to such contemporaneous and similar crimes and where there is only such incidental disclosure of other offenses.

*Kirkpatrick* v. *Commonwealth,* 211 Va. 269, 272, 175 S.E.2d 802, 805 (1970). (citations omitted).

The Commonwealth has advanced no theory that would support the admissibility of the testimony elicited from Emma Charlton on re-direct. The Commonwealth conceded in argument that opening statements are not evidence. Indeed, in this case the court instructed the jury prior to the beginning of the trial itself that "what the attorneys say is not evidence and should not be considered as evidence and you are the final arbiters of what the evidence reveals." This admonition was reiterated by the Commonwealth's Attorney in his opening statement: "I would remind you again that what I say here today or at this time is not evidence and what Mr. Griffin, counsel for the defendant, or Mr. Pappas, say to you isn't evidence either." The purpose of the opening statement is merely to inform the jury of what counsel expects the evidence to be so that they may better understand the evidence. *See generally* 2A Michie's Jurisprudence *Argument And Conduct Of Counsel* §§ 5, 6 (Repl. Vol. 1980). Code § 19.2-265 recognizes that in a felony trial, both the Commonwealth and counsel for the accused have the right to make an opening statement *before* (emphasis added) any evidence is submitted by either side.

Counsel cannot put his client's character into evidence through his opening statement, particularly when the jury has already been instructed that counsels' statements are not to be viewed as evidence. Even if we were to hold that he could, which we do not, the Commonwealth attacked the defendant's character in an improper manner. Fields was on trial for murder, not for encouraging illicit sexual relationships between "his women." While the Commonwealth's Attorney assured the trial court that he could tie the testimony together to develop Fields' motive for the killing, it

is evident that he did not do so. Even if Fields had placed his character as a law-abiding citizen into evidence, the Commonwealth could not show specific unrelated acts of misconduct, but could only elicit testimony about Fields' general reputation for being a law-abiding citizen. The error was thus compounded when the Commonwealth elicited general bad character evidence from Emma Charlton when, as we have shown, the defendant did not first put his character into issue. We cannot say, as a matter of law, that the admission of this testimony had no effect on the jury's verdict.

██ Fields also contends that his right to cross-examine Emma Charlton was improperly restricted by the trial court. While the right to cross-examine an adversary's witness is one of the most zealously guarded rights, it is within the discretion of the court to allow further cross-examination after the right has been substantially and fairly exercised. *Moore* v. *Commonwealth,* 202 Va. 667, 669, 119 S.E.2d 324, 327 (1961). When cross-examination becomes the subject of abuse, it should be restricted. *See Norfolk & Western Ry. Co.* v. *Eley,* 152 Va. 773, 778, 148 S.E. 678, 679, (1929). It is clear from the record that Fields was given wide latitude in his method of cross-examining Charlton, and his right to do so was properly restricted by the court when it became argumentative, repetitive and exceedingly aggressive. We recognize that the purpose of cross-examination is to elicit the truth, but the trial court should never permit a witness to be badgered or intimidated. The court warned counsel a number of times that his manner of cross-examination was improper, yet counsel continued. To have allowed counsel to continue would have added little to his impeachment of Emma Charlton, and the court was within its discretion in restricting it.

For the reasons stated herein, the defendant's convictions are reversed, and the case remanded for a new trial if the Commonwealth be so inclined.

*Reversed and remanded.*

Baker, J., and Barrow, J., concurred.